## COYLE v. MORRISDALE COAL CO. SAME v. JOHNSTOWN COAL & COKE CO. NEW YORK & PHILADELPHIA COAL & COKE CO. v. COYLE. In re TIDEWATER COAL EXCHANGE.

(Circuit Court of Appeals, Second Circuit. March 5, 1923.)

Nos. 148, 171, 188.

1. **Bankruptcy** ⚙︎145(1)—**Action of governing body of unincorporated association, taken to effect liquidation between members, held authorized.**

The executive committee of the Tidewater Coal Exchange, an unincorporated association, on failure of members to make good their overdrafts of coal, and in order to effect liquidation between its debtor and creditor members on closing its business, *held* to have authority, after due notice, to commute the liability of debtor members for coal withdrawn to a money liability at the then market price, and the trustee in bankruptcy of the association *held* entitled, after demand, to enforce such liability.

2. **Exchanges** ⚙︎9—**Recovery by trustee limited to amount fixed by committee and demanded.**

The extent of the liability of a member of a coal exchange was fixed by the action of the executive committee in converting the demand for coal into one for money, in accordance with the rule of the association adopted by it, and in making demand therefor, and in an action by the trustee therefor, as on account, he cannot recover a larger amount by an amendment of the complaint alleging an error in computation by the committee.

3. **Principal and agent** ⚙︎155(1)—**Settlement of claim with agent without authority held not effective.**

Claimed settlement by debtor member of coal exchange or association with an agent of the association, who, as members, were notified, was without authority to make settlements, except subject to approval of the executive committee, which was not given, *held* ineffective.

4. **Bankruptcy** ⚙︎154—**Credit acquired by debtor through voidable transaction not subject to set-off in action by trustee.**

A claimed credit by a debtor of bankrupt, acquired within four months prior to the bankruptcy, and when bankrupt was known by the debtor to be insolvent, cannot be set off in an action by the trustee.

5. **Novation** ⚙︎7—**Assent of creditor essential.**

Novation is the substitution of a new obligation for an old one, and cannot be effected without the consent of the creditor.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Novation.]

⚙︎For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Error to the District Court of the United States for the Southern District of New York.

Actions at law by William Radford Coyle, trustee in bankruptcy of the Tidewater Coal Exchange, against the Morrisdale Coal Company, against the Johnstown Coal & Coke Company and against the New York & Philadelphia Coal & Coke Company. Judgments for plaintiff, and in the first two cases both parties bring error, and in the last case defendant brings error. Affirmed.

For opinions below, see 284 Fed. 294, 301.

In each of the three actions above named, Coyle, as trustee, sued to recover the value of coal withdrawn from some one of the pools of Tidewater Coal Exchange, in excess of coal delivered to the Exchange. In all three cases, both parties moved for a directed verdict, and in each case the trial court directed judgment for Coyle, the plaintiff. Thereupon each defendant took a writ. But, in his actions against the Morrisdale and Johnstown Companies, plaintiff did not receive as large a directed verdict as he demanded, whereupon he took writs in respect of such reduction of amount in suit. All five writs were heard together.

The nature of the Tidewater Exchange, and of its pools, and how the plaintiff below became its trustee in bankruptcy, are matters explained in Re Tidewater Coal Exch. (C. C. A.) 280 Fed. 638, affirming (D. C.) 274 Fed. 1011. The rules of the Exchange, the origin and nature of debtor and creditor members, and the right of the trustee in bankruptcy to sue debtor members for money payment of coal overdrafts are matters sufficiently explained in New River, etc., Co. v. Snider et al., 286 Fed. 667 (C. C. A. 2d. opinion filed January 2, 1923). The opinion of the court below in the action against the Morrisdale Company is in 284 Fed. 294, and that in the case of the Johnstown Company in 284 Fed. 301.

James F. Curtis and Root, Clark, Buckner & Howland, all of New York City (Chauncey Belknap, of New York City, of counsel), for Coyle.

Geo. Wright Hinckley, of New York City, for New York & Philadelphia Coal & Coke Co.

Sullivan & Cromwell, of New York City (Philip L. Miller, of New York City, of counsel), for Morrisdale Coal Co.

Peale & McLaughlin and G. A. McLaughlin, all of New York City (T. K. Schmuck, of New York City, of counsel), for Johnstown Coal & Coke Co.

Before HOUGH, MANTON, and MAYER, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). The issues raised by the pleadings have been largely swept away by the previous decisions of this court, above referred to. The issues now presented to us may be stated under three heads.

I. As April 30, 1920, approached, it became obvious that the Exchange could not continue its activities in the manner theretofore practiced, because it was wholly without means so to do. All of its large expenses had been paid by the coal-carrying railways or the Director General; this necessary support was to be withdrawn; the Exchange had no capital and no means of getting the same, without becoming something it had never been and was not designed to be. Therefore the executive committee began what may fairly be called

a "campaign" to close up its accounts; i. e., to induce, persuade, or threaten its members, who had drawn out more coal than they had shipped, into making good their shortages, and doing so with coal.

In January, 1920, a notice was sent to such debtor members that it would be "necessary" to "balance all accounts" as of February 15th. This plainly meant, balance the same by coal shipments. Other precatory letters followed; one especially advising members, such as and including these defendants, that in view of the cessation of financial support for the Exchange on April 30th, all debits should be "discharged in tonnage"—i. e., coal—before that date. These defendants are among the members who remained obdurate. They did nothing, and on or about June 7th the executive committee gave notice thus (we italicize the parts thought important):

"If your account is not adjusted by July 1, 1920, accept this as formal notice that the executive committee *will*, acting under the current rules [of the Tidewater Coal Exchange], *fix a price, based upon the price it would be necessary to pay at that time to make good your debit*. Draft for the amount involved will be immediately drawn on you by the commissioner."

Still defendants did nothing, and the Exchange did fix a price on or about July 1st, ascertained the debit of members such as defendants, multiplied that coal debit by the price fixed for that grade of coal, stated accounts with defendants (and others), forwarded them and drew drafts for the money result on these defendants (and others), which drafts defendants refused to pay, in or about September, 1920. The trustee in bankruptcy brought these actions in January, 1922, and in a uniform style of complaint set forth the substance of the foregoing, alleged a demand "on or about September 4, 1920," for the money value of the coal debits as stated in the aforesaid accounts (practically for the face of the drafts), and prayed judgment for that sum with interest from July 1, 1920.

Verdicts and judgments went for the sums thus originally sued for; over defendants' contention that they were liable only for the value of debit coal at prices current on (say) February 15, 1920, prices rose sharply between February and July. This is the main question, which we shall consider under the writs brought by all defendants.

II. After process had issued and complaints been served (in January, 1922) the trustee became satisfied that the accounts stated with and drafts drawn upon the Morrisdale and Johnstown Companies were erroneous, in that they did not state the full measure of these defendants' coal shortages, and therefore not their entire indebtedness. He accordingly amended the complaints, by appropriately increasing the amounts of coal and money, but still averred in the amended pleadings that what he wanted judgment for had been demanded "on or about September 4, 1920." For these increased amounts the trial court refused verdict and judgment, and the propriety of these rulings is questioned by the writs brought by the trustee.

III. On November 1, 1920, and admittedly as a method of avoiding, if possible, what L. Hand, J., in the lower court, has well called "a welter of litigation," the executive committee of the Exchange authorized Mr. G. L. Baker, a member of the bar who was professional-

ly familiar with the Exchange methods, to "canvas the debtor and creditor members of the Exchange in the effort to secure their consent to settle their respective accounts on such terms as will result in an arrangement satisfactory to the executive committee." Mr. Baker's authority, which was in writing, confined him to making "a satisfactory settlement," but "no settlement will be closed by you until approved by the executive committee"; further, also, the "arrangement" with him was made "without prejudice to the right of the executive committee to enforce payment of accounts due the Exchange in accordance with its rules, if you are unable to bring about the settlement of all debtor and creditor accounts in a manner satisfactory to the [executive] committee."

By November 1, many debtor members had paid the drafts drawn upon them according to the accounts stated as of July 1, and Baker was instructed that the "interests" of such as had paid or should pay drafts would not be "prejudiced by any settlement which may be made through your negotiations." Cotemporaneously all members were advised in writing that the Exchange was unable "to meet obligations to creditor members," that Mr. Baker had been authorized to act as above set forth, and it was stated that no settlement would be approved by the committee which would prejudice the interests of debtor members who had settled or would settle.

Mr. Baker never succeeded, although his time of action was extended to not later than February 14, 1921, in settling all or nearly all the claims in question. He did procure assignments to himself of some $274,000 of credit members' demands based on the price fixed as of July 1st, and he notified the Exchange that he used these credits (or enough of them for the purpose) to extinguish a somewhat smaller total of similarly calculated debits, including that of the Johnstown Company. In May, 1921, the executive committee formally refused to ratify these so-called "Baker settlements," and bankruptcy supervened within four months of any transfer from Mr. Baker to Johnstown Company of credit claims. The transaction was thus pleaded by defendant:

"Defendant acquired and procured by purchase, certain credits for coal in the Exchange pools, * * * equivalent to the tonnage that the Exchange claimed had been withdrawn by defendant * * * in excess of coal delivered to * * * the Exchange by defendant, * * * [and] said credits so procured were duly assigned to defendant, and the assignment thereof duly accepted by defendant with the knowledge and approval" of the Exchange.

The evidence clearly shows that, when Mr. Baker failed to "clean up" all the affairs of the Exchange as originally hoped, he regarded himself as the owner of credits, which he sold to debtors. That he personally did not at any time deem himself a debtor is plain, and that the Johnstown Company procured credits from Mr. Baker, in order that they might be "set up against our debit," is the way the transaction is described by that officer of defendant who did the work. The Exchange never entered transactions such as the above as completed in its books of account; but it was apprised of all Baker's ac-

tivities, and this and similar "deals" were listed by the Exchange accountants. That no contract or agreement of extinguishment was ever formally made by and between defendant and the Exchange, is fixed by the verdict—a result supported by evidence.

Johnstown Company's defense of a "Baker settlement" was overruled by the trial court, and that company assigns such action for error.

[1] I. The rights of plaintiff against debtor members depend fundamentally on the fact, quite without precedent known to us, that he represents an association without capital, started as a war measure to expedite and facilitate deliveries of coal, and concerned only with balances of coal in kind, which in time found itself compelled to declare and enforce a new principle of settlement, by transforming coal due into money owing, in order to escape the unendurable disorder of leaving the debtor and creditor members to fight out their differences, without any central control. If the Exchange had not, by consent of its members, assumed such control of its own liquidation, the plainly foreseen result would properly have been called a "free fight."

The new rules were in our judgment devised for the express purpose of winding up the Exchange with a minimum of trouble, either legal or commercial. The wording of these rules is sufficiently set forth in the New River Case, supra. They (and especially Nos. 22 and 28) emphasize the dominant idea in the winding-up process, viz. the commissioner was authorized, and indeed required, to summon debit members to ship in their debit coal (rule 22); but when it came to closing accounts the executive committee was to name a price which translated or commuted debit coal into money owed (rule 28). The Exchange never had any authority to sue for coal; it could only sue for money, and then only after price named and demand made under rule 28. The Exchange, and therefore this trustee, never had any cause of action until the price had been named, etc. There was no obligation on the Exchange to name a price, or any particular price, until in the judgment of the executive committee the processes of settlement or winding up demanded it. Of course, unreasonable delay, or an unreasonable price, might have been obnoxious to fundamental principles of equity as applied to law; but there is no evidence (and indeed the point is not argued) that there was any lack of reason in the actions of the executive committee.

The defense is that demand prior to price fixing fixed prices. This contradicts the very language of the rule. But it is urgently argued that it was unjust to fix prices at a time when they had markedly risen; at least, this is the substance of the defense as argued. We see no injustice; at all times these defendants owed either coal or money, and if the coal which they owed and would not pay and could dispose of was continually appreciating in value while they withheld it, we fail to see why the money which they owed as a result of owing the coal should not correspondingly and proportionately increase. The fact is, and it is admitted, that the liquidation price fixed as of July 1st was, if anything, distinctly under the market at the time; it was quite possible that, if defendants had paid on demand, they would

289 F.—28

have made some profit by selling the coal which the executive committee translated into money as of July 1st.

For these reasons, we think that the ruling of the court below as to the first kind of error alleged was correct.

[2] II. In order to justify any action, whether by Exchange or by trustee, a price naming and a demand was necessary. This results from the peculiar nature of the claim made. Whether any other method of recovering from members such as these defendants might have been chosen, we need not consider. The method pursued and at bar consists in suing on an account; not technically an account stated, as the consent express or implied of each defendant is not alleged, but certainly upon an account rendered. Each action is for a definite sum of money, not by way of damages, but as due and owing. This point is not technical, but substantial. A creditor may sue for a definite sum as an amount due for goods sold and delivered, based on a price agreed to be paid, and it makes small difference whether the complaint be analyzed as one in debt or assumpsit. But in this instance the very cause of action arose from a resolution of the executive committee acting in accordance with rule. The only promise or assumption that could ever be alleged against or imputed to a defendant was an agreement to abide by the rule and reasonable and lawful action thereunder.

The argument for the trustee is in our judgment quite inconsistent in repudiating all suggestion of a demand impliedly fixing a price prior to July 1st and then using the demands for tonnage made before that date as sufficient to authorize wide departures in his own favor from the accounts rendered as of July 1st and the cotemporaneous action of the executive committee which created the cause of action on which the trustee is now suing.

For these reasons, not as a technical rule of pleading, but as a substantial matter, depending on the singular nature of these actions, we hold with the court below that the basis of every action like the three before us is the rendition of an account and a demand pursuant thereto made before summons served. Where a specific demand is necessary to the creation of a specific cause of action, it is, generally speaking, difficult to see how an ad damnum can be increased when there is no demand before suit to support it. Whether this can ever be done we need not investigate, but we hold that such procedure is impossible under rule 28. Whether any remedy is left in the trustee by reason of the errors of the executive committee is not a matter which we need now consider.

III. What has been called throughout this record the "defense of a Baker settlement" was properly disposed of below. The facts being undisputed, the inferences from them were for the court; both parties having moved for a directed verdict. Therefore it might be enough to hold that this defense is concluded by the verdict—there being several aspects of the evidence quite sufficient to uphold the same. But we shall consider the facts substantially in the way they have been presented at bar.

[3] (a) There is abundant testimony tending to show that anything and everything Mr. Baker did was tentative; i. e., of no binding effect on anybody, unless what he did received the formal approval of the executive committee of the Exchange and no one else. That such formal approval was never given, but, on the contrary, Baker's efforts disapproved of, is quite plain.

(b) It is also legitimate inference, from the very writings given to Baker and distributed to members, that his efforts were to be tentative unless he could close up the whole remaining business of debtor and creditor accounts; and this he never did.

[4] (c) It might also well be said that defendant is concluded by its own pleading, which sets forth the Baker transaction, not as an accord or satisfaction, or the like, but as an extinguishment of debt by the acquisition of credit claims. This matter is surely concluded by the verdict, for there was abundant evidence that, when defendant Johnstown Company assumed the position which it pleaded, it did so within four months of bankruptcy and at a time when the Exchange had given notice to all members that it was without means to pay its creditor members. When a concern gives this notice to persons like defendant, who were bound to know that it was without capital of any kind, it is surely necessary for any reasonable man to draw the inference of insolvency, as defined in Bankruptcy Act, § 1 (15), being Comp. St. § 9585. This fully justifies the ruling in the court below that the defense was obnoxious to section 68b of the Bankruptcy Act, being Comp. St. § 9652.

[5] (d) Nor can any novation be held to have relieved defendant Johnstown Company from its obligation to pay as a debtor member. Novation is the substitution of a new obligation for an old one; it usually suggests the substitution of a party or parties; it is not a modification of some detail of contract; it is the making of a new contract; and further, and especially, it implies and requires the consent of the creditor under the contract or obligation which suffers novation. Rensselaer, etc., Co. v. Irwin, 249 Fed. 726, 161 C. C. A. 636.

Whatever change of parties took place here necessarily meant that Mr. Baker became a debtor in substitution of Johnstown Company, a position which he somewhat eagerly refused to acknowledge when a witness; and whatever creditors' consent had to be given must necessarily have come from the executive committee of the Exchange; certainly no such consent was ever given. Consequently novation is an impossibility.

The judgments brought before us by writs of error are severally affirmed, without costs.